# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

MARVIN SEEGER, BRADLEY
GAMROTH, ROBERT MCCLAIN,
AND JOANNE BLAREK,

        Plaintiffs,

      v.                                  Case No. 05-C-714

AFNI, INC.,

        Defendant.

---

**DECISION AND ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**

---

## I.  PROCEDURAL BACKGROUND

On July 7, 2005, the plaintiffs, Marvin Seeger ("Seeger") and Bradley Gamroth ("Gamroth"),

filed a single count complaint against the defendant, AFNI, Inc. ("AFNI"), alleging that AFNI's

attempt to collect a collection fee from the plaintiffs violated the Fair Debt Collection Practices Act

("FDCPA"), 15 U.S.C. § 1692, et. seq.  Specifically, the plaintiffs alleged that AFNI's attempt to

collect collection fees violated 15 U.S.C. § 1692f, that AFNI's representation that collection fees

were owed violated 15 U.S.C. §§ 1692e, 1692e(2)(A), and 1692e(5), and that AFNI failed to state

the true amount of the debt owed, in violation of 15 U.S.C. § 1692g(a)(1).

On November 29, 2005, the plaintiffs filed an amended complaint adding Robert McClain

("McClain") and Joanne Blarek ("Blarek") as plaintiffs.  The amended complaint also alleged, in

addition to the FDCPA violations, violations of the Wisconsin Consumer Act ("WCA"), Wis. Stats.

§ 421-425.  Specifically, the plaintiffs alleged that the addition of collection fees violated Wis. Stat. § 422.202, and that AFNI's attempt to collect collection fees violated Wis. Stat. § 427.104(1)(j).

On May 2, 2006, the plaintiffs filed a motion for class certification.  The class was defined as

> (a) all natural persons in the State of Wisconsin (b) who were sent a collection letter by AFNI claiming a collection fee (c) for Cingular telephone service obtained for personal, family or household purposes, (d) on or after a date one year prior to the filing of this action, (e) that was not returned by the postal service.

This class was certified on August 9, 2006.

Currently pending before the court is the defendant's motion for summary judgment, and the plaintiffs' motion for summary judgment, both of which are fully briefed and are ready for resolution. For the reasons which follow, the plaintiffs' motion for summary judgment will be granted in part and denied in part, and AFNI's motion for summary judgment will be granted in part and denied in part.

## II. FACTUAL BACKGROUND

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact.  Likewise, the plaintiffs' motion for summary judgment was accompanied by a set of proposed findings of fact.  In addition, the plaintiffs' response to the defendant's motion for summary judgment contained responses to the defendant's proposed findings of fact as well as some additional proposed findings of fact.  Likewise, the defendant's response to the plaintiffs' motion for summary judgment contained responses to the plaintiffs' proposed findings of fact as well as some additional proposed findings

2

of fact. A review of the parties' respective proposed findings and the responses thereto reveal that the following are material and (except where noted) undisputed facts in this case.

Each of the plaintiffs entered into wireless agreements with Cingular Wireless, Ameritech Mobile Communications, and/or Worldcom. (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 1.)

Seeger's Cingular contract was for 800 "anytime" minutes per month. Seeger, Blarek, McClain, and Gamroth had monthly plans, were billed for a set number of minutes per month, regardless of whether they used those minutes, and were charged per minute if they exceeded their allotment of minutes. (Plaintiffs' Proposed Additional Findings of Fact ("PPAFOF") ¶¶ 36-40.)

Between September 2004 and June 2005, AFNI sent debt collection letters to Seeger, Gamroth, and McClain regarding alleged debts, and which referred to Cingular as the original creditor.[1] (Plaintiffs' Proposed Findings of Fact ("PPFOF") ¶ 1.) These letters sought to collect a "Collection Fee" of 15% of the amount of the "original balance." (PPFOF ¶ 3.) McClain and Blarek received another form letter from AFNI, and this letter included a collection fee in the balance. (PPFOF ¶ 4-5.) AFNI intended to include the collection fee in the collection letters. (PPFOF ¶ 26.)

AFNI had purchased the plaintiffs' and class members' accounts from Cingular. (PPFOF ¶ 17.) AFNI received the account information from Cingular on a CD-ROM and uploaded it into AFNI's collection system. (PPFOF ¶ 18.) Nothing in the account data sent from Cingular to AFNI specified that AFNI should charge, or was permitted to charge, any specific amount as a collection fee. (PPFOF ¶ 19.)

---

[1]The parties dispute whether Blarek received one of these letters.

Pursuant to a subpoena, Cingular Wireless, LLC provided "standard form service agreements utilized by Cingular or its predecessor corporations in the State of Wisconsin since January 1, 1992, to the extent that Cingular has owned consumer accounts created by those standard form service agreements."  (PPFOF ¶ 6; Blythin Decl. Ex. F and G.)

Some of the Cingular contracts provided by Cingular Wireless contained the language:

> You agree to pay to CINGULAR the fees of any collection agency, which may be based on a percentage at a maximum of 33% of the debt, and all costs and expenses, including reasonable attorneys' fees and court costs, incurred by CINGULAR in exercising any of its rights and remedies when enforcing any provisions of this Agreement.

(PPFOF ¶ 7; Blythin Decl. Ex. G at C00010.)

The remaining Cingular contracts provided by Cingular Wireless contained the language:

> You agree to reimburse us the fees of any collection agency, which may be based on a percentage at a maximum of 33% of the debt, and all costs and expenses, including reasonable attorneys' fees, we incur in such collection efforts.

(PPFOF ¶ 8; Blythin Decl. Ex. G at C00025.)

McClain's Cingular contract contained the language found in PPFOF ¶ 8.

Several of the AT&T Wireless contracts provided by Cingular Wireless contained the language "You agree to pay all costs including reasonable attorneys fees, collection fees, and court costs we incur in enforcing this Agreement through any appeal."  (PPFOF ¶ 10; Blythin Decl. Ex. G at C00202.)

Gamroth's Ameritech Wireless contract provided that "If we refer your account to an attorney or agency for collection, you agree to pay our actual collection costs, including court costs and reasonable attorneys' fees, unless prohibited by law.  (PPFOF ¶ 11; Blythin Decl. Ex. K.)

McClain's Cingular contract stated that:

4

If we terminate your service for nonpayment or other default before the end of the Service Commitment, or if you terminate your service for any reason other than (a) in accordance with the 15-day cancellation policy, or (b) pursuant to a change in terms, conditions or rates as set forth below, you agree to pay us, in addition to all other amounts owed, an Early Termination Fee in Florida, Georgia, South Carolina, North Carolina, Kentucky, Tennessee, Mississippi, Louisiana, Alabama, New York, applicable Parts of Indiana and applicable Parts of New Jersey in the amount of $240 per phone divided by the total number of months in your service commitment, then multiplied by the remaining months or parts of months in such Service Commitment, and in all other areas in the amount of $150 per phone.

(PPFOF ¶ 14; Blythin Decl. Ex. J.)

One of Gamroth's contracts with Cingular's predecessor, Ameritech Wireless, stated that:

Important: If you do not remain on an eligible Ameritech Mobile Service Project for the duration of your Minimum Term, you will be responsible for a $150 early cancellation fee per mobile number, in addition to all other outstanding charges on your account, and any early cancellation fees that may apply.

(PPFOF ¶ 15; Blythin Decl. Ex. K.)

Blarek and Seeger stated in their respective depositions that they had no reason to believe that their contracts with Cingular were any different from McClain's or Gamroth's. (PPFOF ¶ 16; Def's Resp. to PPFOF ¶ 16; Blarek Dep. at 20-21, Seeger Dep. at 19.)

The Cingular contracts provided by Cingular state that:

[I]f you terminate your service for any reason other than a change of terms, conditions, or rates as set forth below, or if CINGULAR terminates your service for nonpayment or other default before the end of the Service Commitment, you hereby agree to pay CINGULAR, as liquidated damages and not as a penalty, in addition to all other amounts owed, the termination charge of $150 per wireless phone on the account ("Termination Fee")

(PPFOF ¶ 29; Blythin Decl. Ex. G at C00009.)

The AT&T contracts provided by Cingular state that:

If you terminate service more than 30 days after your activation date, but before the end of your fixed term, or we terminate following your default, you will be in

5

material breach of this agreement. You agree our damages will be difficult or impossible to determine and agree to pay us, as a reasonable estimate of our damages and in addition to all other amounts owing, a cancellation fee for each number.

(PPFOF ¶ 30; Blythin Decl. Ex. G at C00256.)

Seeger, McClain, and Blarek's cellular phone accounts were used primarily for personal, family, or household purposes. (PPFOF ¶ 31, 33, 34.) The parties dispute whether Gamroth's cellular phone account was used for business or personal, family, or household purposes. (PPFOF ¶ 32; Def.'s Response to PPFOF ¶ 32; DPFOF ¶ 12.)

AFNI does not examine each and every Cingular form customer service agreement to determine whether the agreement purports to allow AFNI to collect a collection fee. (PPFOF ¶ 21.)

AFNI's debt collection letters are reviewed by an outside attorney as part of the American Collectors Association ("ACA") letter approval group. (PPFOF ¶ 22.) The ACA letter approval group examines letters for compliance with the FDCPA. (PPFOF ¶ 23.)

For state law compliance, AFNI relies on a document identified as "ACA's Guide to State Collection Laws and Practices, December 1998," which is a collection guidelines document created by the ACA.[2] (PPFOF ¶ 24.)

ANFI did not contact the Wisconsin Department of Financial Institutions before deciding to impose a collection fee. (PPFOF ¶ 27.) On September 21, 2005, AFNI wrote to the Wisconsin Department of Financial Institutions with the following inquiry:

---

[2]The parties dispute the procedures that AFNI employs to comply with state law. The plaintiffs contend that AFNI relies solely on the "ACA's Guide to State Collection Laws and Practices." AFNI contends that it has a compliance staff that reviews the "ACA's Guide to State Collection Laws and Practices" as well as other bulletins and information from the Debt Buyers Association. AFNI also contends that Jim Hess, Director of Business Development for AFNI, has reviewed excerpts of the Wisconsin Consumer Act. (Def.'s Resp. to PPFOF ¶ 24; DPFOF ¶ 13; DPFOF ¶ 16.)

6

I have an inquiry regarding the addition of the collection of fees by a cellular telephone company. In 1999 a contract was signed which provided for the creditor to add fees related to the collection of a consumer account. However, I do not see that this is specifically provided for under Wisconsin law. Could you please advise me as to any opinions by your office regarding this matter? Furthermore, if no opinions are available, could you please let me know what type of a transaction this would be considered, open-ended credit, etc, so that I could further my investigation. Any assistance that you can provide would be appreciated. Thank you.

Anna

(DPFOF ¶ 5; Anderson Aff. Ex. 1.)

On September 22, 2005, Kathleen Hanna, Compliance Officer with the Department of Financial Institutions - Office of Consumer Affairs, responded:

Dear Anna:

Cell phone contracts are not an extension of credit, as you pay for the service as you use it. To our knowledge, there is no regulation to prohibit collection of fees being contracted for in a non-credit transaction.
You may want to visit the FCC Web site for more information on cell phone fees [http://www.fcc.gov/].

(DPFOF ¶ 6; Anderson Aff., Ex. 1.)

AFNI did not contact an attorney with expertise in the Wisconsin Consumer Act before deciding to impose a collection fee.  (PPFOF ¶ 28.)

### III.  SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

7

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ. P. 56(e)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "'[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion.'" *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of*

8

*Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252). Because the parties in this case have filed cross motions for summary judgment, the court must extend the required favorable inferences to each when considering the other's motion. *See McCarthy v. Kemper Life Ins. Co.*, 924 F.2d 683, 687 (7th Cir. 1991).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

As stated above, both parties have filed motions for summary judgment. In support of their motion, the plaintiffs argue that AFNI, by assessing a 15% collection fee, violated the FDCPA and WCA. Specifically, the plaintiffs contend that the cell phone contracts at issue are "consumer credit transactions," and that collection fees on these types of transactions are prohibited by the WCA. Moreover, the plaintiffs argue that AFNI violated the FDCPA and WCA by charging a collection fee which was not authorized by any customer service agreements or permitted by law. Lastly, the plaintiffs contend that AFNI is not entitled to the bona fide error defense.

In response, and in support of its motion for summary judgment, AFNI argues that the cell phone contracts at issue are not "consumer credit transactions," and thus collection fees are not

9

prohibited by the WCA. Further, AFNI contends that the collection fee was in fact authorized by customer service agreements, and that such fees are otherwise permitted by Wisconsin state law. Finally, AFNI argues that, even if it did violate the FDCPA or WCA, the violation was the result of a bona fide error.

## A. WCA Violation for Charging a Collection Fee Arising Out of a Consumer Credit Transaction

The plaintiffs argue that AFNI's charging of a collection fee is prohibited as a matter of law in Wisconsin under the WCA. Specifically, the plaintiffs contend that the cellular service contracts at issue are consumer credit transactions, and that the WCA prohibits the addition of a collection fee to debts arising out of a consumer credit transaction.

The purpose of the WCA is "[t]o protect customers against unfair, deceptive, false, misleading and unconscionable practices by merchants" and to "permit and encourage the development of fair and economically sound consumer practices in consumer transactions." Wis. Stat. § 421.202(2). To promote these purposes, the Act is to "be liberally construed and applied" *Id*. *See also* Wis. Stat. 425.301 ("The remedies provided by this subchapter shall be liberally administered to the end that the customer as the aggrieved party shall be put in at least as good a position as if the creditor had fully complied with chs. 421 to 427.").

Wis. Stat. § 422.202 authorizes certain additional charges a merchant may bargain for and receive in a consumer credit transaction, in addition to the finance charge:

422.202. Additional charges.

(1) In addition to the finance charge permitted by this subchapter, a merchant may bargain for and receive any of the following additional charges in connection with a consumer credit transaction:

10

Section 422.202 goes on to list a number of additional charges which are acceptable in connection with a consumer credit transaction. Collection fees are not included in this list of permissible charges.

Section 422.202 further states, in relevant part:

> Except as otherwise provided in chs. 421 to 427, assessing an additional charge which is not authorized by this section and which is not included by the creditor as part of the finance charge, or which is authorized by this section but assessed in a manner inconsistent with this section, is a violation subject to § 425.304.

Wis. Stat. § 422.202(3)(b).

AFNI does not dispute that the addition of a collection fee is prohibited in connection with a consumer credit transaction, even if the collection fee was provided for in an underlying agreement. However, AFNI contends that the plaintiffs' cellular service contracts are not consumer credit transactions for purposes of the WCA, and thus the WCA is inapplicable. (Def.'s Resp. Br. at 11.)

Under the WCA, a "consumer credit transaction" is defined as:

> a consumer transaction between a merchant and a customer in which real or personal property, services or money is acquired on credit and the customer's obligation is payable in installments or for which credit a finance charge is or may be imposed, whether such transaction is pursuant to an open-end credit plan or is a transaction involving other than open-end credit. The term includes consumer credit sales, consumer loans, consumer leases and transactions pursuant to open-end credit plans.

Wis. Stat. § 421.301(10).

As such, in order for a transaction to constitute a "consumer credit transaction," there must be: (1) a consumer transaction; (2) between a merchant and a customer; (3) in which real or personal property, services or money; (4) is acquired on credit; and (5) the customer's obligation is payable in installments or for which credit a finance charge may be imposed. The WCA provides definitions for the relevant terms in dispute. Specifically, the parties dispute whether all of the plaintiffs are

11

"customers," whether the plaintiffs purchased "real or personal property, services or money," whether these were acquired on "credit," and whether the plaintiffs' obligation was "payable in installments" or subject to a "finance charge." Each of these definitions will be discussed in turn.

**a. Definition of Customer**

A "customer" is defined as "a person other than an organization . . . who seeks or acquires real or personal property, services, money or credit for personal, family or household purposes." Wis. Stat. § 421.301(17).

AFNI argues that plaintiff Gamroth is not a "customer" for purposes of the definition of "consumer credit transaction" because he acquired his cell phone for primarily business purposes. AFNI points to Gamroth's deposition testimony in support of its argument:

> Q.    Mr. Gamroth, I just want to make clear for the record. Earlier you testified that the accounts referred to in Exhibit 13 and 14 were primarily for business purposes, correct?
>
> A.    I used - when I used the phones, that's what I used them for.

(Gamroth Dep. at 17-18, 46-47.)

However, this court has already ruled on this issue in its order granting class certification. Order of Aug. 9, 2006, at 6-7 (Dkt. No. 41.) In the order, this court concluded that:

> The defendants assert that plaintiff Gamroth is not an adequate member of the class because he admittedly used the phone for "primarily business purposes," and hence Gamroth himself is not a member of the class, as defined by the plaintiffs. However, Gamroth's cell phone account was in Gamroth's name (as opposed to a business name), Gamroth paid for his phone with a personal credit card, and Gamroth's wife used the phone for seemingly regular household purposes. Gamroth's use of the phone to conduct telephone conversations with potential employers does not nullify his standing as a consumer within the meaning of the WCA and FDCPA.

*Id.*

12

Although this court concluded that Gamroth was a "consumer" within the meaning of the WCA, the analysis as to whether Gamroth is a "customer" is identical. AFNI argues, as before, that Gamroth admitted using the phone primarily for business purposes. The evidence to the contrary, namely Gamroth's cell phone account in his personal name, his payment with his personal credit card, and his wife's use of the phone for household purposes, is also identical. As such, this court's prior conclusion that Gamroth was a "consumer" also leads to the conclusion that Gamroth was a "customer" under the WCA.

**b. Acquisition of Services**

The parties also dispute whether the cellular phone contracts are contracts for "services" as defined by the WCA, and as used in the definition of "consumer credit transaction."

Under the WCA:

(a) "Services" includes:

1. Work, labor and other personal services;

2. Privileges with respect to transportation, hotel and restaurant accommodations, education, entertainment, recreation, physical culture, hospital accommodations, funerals, cemetery accommodations, and the like; and

3. Insurance provided in connection with a consumer credit transaction.

(b) "Services" does not include any services of common carriers if the tariffs, rates, charges, costs or expenses of such common carriers are required by law to be filed with or approved by the federal government or any official, department, division, commission or agency of the United States.

Wis. Stat. § 421.301(42).

AFNI argues that the cellular phone contracts are not contracts for "services" as defined under the WCA because cell phone services are not included in the list of items constituting services in §

13

421.301(42). As further support, AFNI cites the deposition testimony of the plaintiffs, in which they admit that their contracts with Cingular did not meet the definition of "services" as described in § 421.301(42). For example, plaintiff McClain testified that:

> Q.     So would you agree with me then that your contract with Cingular did not - was not a contract for any work, labor or personal services?
>
> A.     Not that I recall.
>
> Q.     It was not, correct.
>
> A.     Not that I recall.
>
> Q.     Would you agree that you did not contract with Cingular for any privileges with respect to transportation, hotel and restaurant accommodations, education, entertainment, recreation, physical culture, hospital accommodations, funerals, cemetery accommodations, or the like?
>
> A.     Not that I recall.

(McClain Dep. at 24.)

The other plaintiffs testified in a similar manner, admitting that they did not contract with Cingular for "work, labor or personal services," or "privileges with respect to transportation, hotel and restaurant accommodations, education, entertainment, recreation, physical culture, hospital accommodations, funerals, cemetery accommodations, or the like." (Blarek Dep. at 21-23; Seeger Dep. at. 22-24; Gamroth Dep. at 28.) AFNI argues that these admissions constitute judicial admissions to which the plaintiffs should be held. (Def.'s Reply Br. at 13.)

Although the plaintiffs stated in their deposition testimony that their contracts with Cingular were not contracts for services as defined in the WCA, the plaintiffs' beliefs regarding this issue are irrelevant because this is an issue of law rather than a question of fact. As this court has previously held in an earlier motion in this case, "[w]hether the plaintiffs' contracts constitute credit transactions

14

for the purposes of WCA and FDCPA is a question of law, and is therefore a question for the court, not the plaintiffs." Order of Aug. 9, 2006, at 6-7 (Dkt. No. 41) (citing *Fletcher v. Eagle River Mem'l Hosp., Inc.*, 456 N.W.2d 788, 795, 156 Wis. 2d 165, 179 (Wis. 1990)). Moreover, whether each of the elements of a "consumer credit transaction" is present in this case, including the element of whether the cellular phone contracts were contracts for "services" under the WCA, is a question of law. *See Palacios v. ABC TV & Stereo Rental, Inc*., 123 Wis. 2d 79, 83, 365 N.W.2d 882, 885 (Wis. Ct. App. 1985) (holding that "[w]hat sec. 421.301(9), Stats., means by 'consumer credit sale,' i.e., what elements it comprises, is a question of law; what the parties did presents questions of fact; and whether the elements of a 'consumer credit sale' are present in the instant case is a question of law.").

Furthermore, judicial admissions are only applicable to questions of fact, and not to questions of law. *See McCaskill v. SCI Mgmt. Corp*., 298 F.3d 677, 682 (7th Cir. 2002) ("The statement at oral argument in this case was similarly a statement of legal opinion, not a stipulation of fact. As such, it is not a judicial admission binding on the appellee, and certainly is not binding on this court."). As the question of what constitutes "services" is a question of law, the plaintiffs' statements regarding their beliefs as to whether cellular phone service meets the legal definition of "services" under the WCA is not a judicial admission binding on the plaintiffs.[3]

In response to AFNI's other argument, namely that cellular phone services are not included in the list in § 421.301(42), the plaintiffs argue that the definition of "services" is extremely broad and that the list is not exclusive. In support of this contention, the plaintiffs note that §

---

[3]AFNI also argues that because the plaintiffs did not object during the depositions that the questions asked of the plaintiffs called for legal conclusions, the plaintiffs waived this argument. (Def.'s Br. in Opp. at 15.) This argument is unavailing. The plaintiffs are not arguing that this testimony should be excluded, and AFNI is free to cite these depositions. However, the court is free to give the deposition testimony its appropriate consideration.

15

421.301(42)(a) merely states that "'Services' includes," and that § 421.301(42)(a)(2) includes the phrase "and the like." According to the plaintiffs, these terms indicate that the list is not exclusive or fully descriptive. As further support for this broad reading of the statute, the plaintiffs note that other definitions found in § 421.301 contain the term "means" rather than "includes," and that if the legislature meant to create an exclusive list it would have used the term "means." *See, e.g.*, Wis. Stat. § 421.301(28) ("'Organization' means . . ."); Wis. Stat. § 421.301(32) ("'Person related to' with respect to a natural person means . . ."). Moreover, the plaintiffs argue that the agreements in question contain titles such as "Wireless Service Agreement," indicating that these agreements are for services. (Pl.'s Br. in Opp. at 16; Blythin Decl. Ex. J.)

To be sure, cellular phone services are not explicitly listed under § 421.301(42). However, I conclude that the definition of "services" is sufficiently broad such that it is reasonable to include cellular phone services within the WCA's definition of "services." The types of services listed in § 421.301(42)(a)(2) are general and broad, and not necessarily related to each other (e.g. education, recreation, cemetery accommodations). Moreover, the phrase "and the like" is not especially limiting, and even less limiting in light of the divergent categories of services listed in § 421.301(42)(a)(2). To be sure, it is not entirely clear what would constitute a service which is "like" the various types of services listed. But, the parties do not dispute that cellular services are a type of services, and the broad definition of services which also includes the broadening phrase "and the like" would reasonably include cellular services.

## c. Acquired on Credit

The parties dispute whether the plaintiffs' cell phone contracts involved the extension of "credit" for purposes of the WCA.

16

"Credit" is defined as "the right granted by a creditor to a customer to defer payment of debt, to incur debt and defer its payment or to purchase goods, services or interests in land on a time price basis." Wis. Stat. § 421.301(14).

As with the definition of "services," AFNI argues that the plaintiffs admitted in their deposition testimony that they did not acquire their cell phone services on credit. (Def.'s Br. at 7-11.) However, as stated above, whether an element of a "consumer credit transaction" is present in this case, including the element of whether the cellular phone services were acquired on credit, is a question of law. Such being the case, the plaintiffs' beliefs regarding this issue are irrelevant to a legal determination as to whether the cellular phone services at issue are an extension of credit.

AFNI argues that the cell phone contracts at issue did not confer a right to defer payment of debts owed, incur bills and defer payment, or purchase service on a time price basis. Rather, according to AFNI, the plaintiffs either pre-paid for their service or paid as they used. (Def.'s Br. in Opp. at 13.)

The plaintiffs, on the other hand, contend that the cell phone service plans allowed the plaintiffs to incur debt and defer its payment because the service plans allowed the plaintiffs to go over their monthly allotment of minutes and pay later, and because the plaintiffs would incur an early termination fee if they cancelled service before the end of the contract. As such, according to the plaintiffs, the contracts are for services acquired on credit. (Pl.'s Br. in Opp. at 16-17.) In support, the plaintiffs cite *Murray v. New Cingular Wireless Servs.*, a case involving Cingular and the Fair Credit Reporting Act ("FCRA"). 432 F.Supp.2d 788 (N.D. Ill. 2006).

In *Murray*, the court held that:

17

consumers who sign up for a wireless phone plan are extended credit because they pay for service at the end of the month rather than buying the minutes in advance. The FCRA defines credit as 'the right . . . to purchase property or services and defer payment therefore,' section 1691a(d), and this offer falls squarely within that definition. At a minimum, a consumer must sign up for a plan that is $ 29.99, but this credit can extend into hundreds or thousands of dollars depending on the consumer's actual use and the plan selected . . . Virtually 100% of the wireless phone service purchased by the consumer would be on credit.

*Id*. at 791.

At issue in *Murray* was whether Cingular's advertisement, which offered a free phone when the individual activates a new line of service on a qualified calling plan, constituted a "firm offer of credit" for purposes of the FCRA, 15 U.S.C. § 1681a(1). *Id*. In determining that a cell phone contract is an extension of credit, the court distinguished these contracts from residential leases, which the Seventh Circuit had held did not constitute credit transactions because the tenant pays rent on the first of each month for the right to occupy the premises for the coming month. *Id*.; *citing Laramore v. Ritchie Realty Mgmt. Co.*, 397 F.3d 544, 547 (7th Cir. 2005). In contrast, according to the court, "wireless customers pay for services after the actual use of the services. By definition, such a payment scheme puts Cingular at risk that the customer could default on payment which is essentially what credit is all about." *Id*.

The plaintiffs contend that this analysis of the FCRA is applicable to an analysis of the WCA because one of the purposes of the WCA is "[t]o coordinate the regulation of consumer credit transactions with the policies of the federal consumer credit protection act." Wis. Stat. § 421.102(2)(d); *see also First Wisconsin Nat'l Bank v. Nicolaou*, 113 Wis. 2d 524, 532, 335 N.W.2d 390, 394 (Wis. 1983). The FCRA is part of the Federal Consumer Credit Protection Act, and defines credit as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and

18

defer its payment or to purchase property or services and defer payment therefor." 15 U.S.C. § 1691a(d). This definition, as noted by the plaintiffs, is virtually identical to the definition of "credit" found in the WCA.

In addition, the plaintiffs cite *Milwaukee Alarm Co., Inc. v. Chaney,* 217 Wis. 2d 290, 577 N.W.2d 387 (Wis. Ct. App. 1998)*,* to support their contention that because the plaintiffs incur penalties for cancelling early, they "incur debt and defer its payment." (Pl.'s Br. at 16-17.)[4] In *Milwaukee Alarm*, the court held that an alarm service contract was an extension of credit under the WCA. *Id*. The contract in *Milwaukee Alarm* was a five year contract for alarm services in which the plaintiff agreed to pay $19 per month, which was billed quarterly. *Id*. The contract provided that if the plaintiff terminated the contract early, he was obligated to pay "one-half (1/2) the service fees for the balance of the Agreement period." *Id*. In concluding that this was an extension of credit , the court reasoned that the plaintiff "incurred debt" the moment he signed the contract because of his liability to pay money to Milwaukee Alarm for services not yet provided, and, due to the termination clause, for services he may never receive. *Id*. Moreover, the court concluded that the plaintiff was allowed to defer payment because he did not have to pay the termination fee if he carried the contract to term. *Id*.

To be sure, AFNI notes that *Murray* was not decided under the WCA, and that *Milwaukee Alarm* is an unpublished opinion. Although this may limit their precedential value, the reasoning in

_____

[4]The plaintiffs primarily cite *Milwaukee Alarm* to support their contention that the plaintiffs' obligations were not payable in installments, as will be discussed below. However, *Milwaukee Alarm* primarily deals with whether an obligation is an extension of credit.

19

each case is still helpful.[5]  As noted by the court in *Murray*, purchasers of cell phone services receive their services prior to paying for them, which technically amounts to a deferment of payment. Moreover, as noted in *Milwaukee Alarm*, an individual who upon the signing of a contract has an unwavering obligation to eventually pay money to a service provider has incurred debt.  In the case at hand, the plaintiffs were obligated to eventually pay money to Cingular for cell phone services upon the signing of the contract, and thus incurred debt.  Moreover, the plaintiffs were allowed to defer payment of this debt for cell phone services by paying for these services after having received them.  As such, it appears that the cellular phone contracts met the definition of credit under the WCA, as they allowed the plaintiffs to incur debt and defer its payment.

AFNI also argues that the administrator of the WCA has already ruled that cellular phone contracts are not an extension of credit under the WCA.  AFNI cites an e-mail it received from Wisconsin Department of Financial Institutions ("DFI"), in response to an inquiry by AFNI sent to the Secretary of the DFI on September 21, 2005:

> I have an inquiry regarding the addition of the collection of fees by a cellular telephone company. In 1999 a contract was signed which provided for the creditor to add fees related to the collection of a consumer account. However, I do not see that this is specifically provided for under Wisconsin law. Could you please advise me as to any opinions by your office regarding this matter? Furthermore, if no opinions are available, could you please let me know what type of a transaction this would be considered, open-ended credit, etc, so that I could further my investigation. Any assistance that you can provide would be appreciated. Thank you.
>
> Anna

(DPFOF ¶ 5; Anderson Aff. Ex. 1.)

---

[5]AFNI argues that because *Milwaukee Alarm* is unpublished, it should have no precedential value under Wis. Stat. § 809.23(4) ("an unpublished opinion is no precedential value").  However, I cite this case not as precedent, but merely to help illustrate what types of contracts could constitute an extension of credit or a consumer credit transaction.

20

On September 22, 2005, Kathleen Hanna, Compliance Officer with the DFI - Office of

Consumer Affairs, responded:

> Dear Anna:
>
> Cell phone contracts are not an extension of credit, as you pay for the service as you use it. To our knowledge, there is no regulation to prohibit collection of fees being contracted for in a non-credit transaction.
> You may want to visit the FCC Web site for more information on cell phone fees [http://www.fcc.gov/].

(DPFOF ¶ 6; Anderson Aff., Ex. 1.)

Under Wis. Stat. § 426.104(1)(b), "the administrator within the limitations provided by law

shall: . . . (b) Counsel persons and groups on their rights and duties under chs. 421 to 427 and 429."

"Administrator" is defined under the WCA as "the secretary of financial institutions." Wis. Stat.

426.103. As such, the Secretary of the DFI is the administrator of the WCA for purposes of Wis.

Stat. § 426.104(1)(b).

The WCA further provides:

> (a) No provision of chs. 421 to 427 and 429 or of any statute to which chs. 421 to 427 and 429 refer which imposes any penalty shall apply to any act done or omitted to be done in conformity with any rule or order of the administrator or any written opinion, interpretation or statement of the administrator, notwithstanding that such rule, order, opinion, interpretation or statement may, after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason.

Wis. Stat. § 426.104(4)(a).

AFNI argues that because a representative of the Secretary of the DFI provided a statement

concluding that cell phone contracts are not an extension of credit, this determination is conclusive

on this issue for purposes of this action. (Def.'s Br. at 7.)

21

In response, the plaintiffs argue that § 426.104(4)(a) only protects individuals from liability under the WCA when they rely upon a written opinion of the administrator, and that in the case at hand, AFNI's e-mail was sent months after the lawsuit was initiated. Furthermore, the plaintiffs contend that although the WCA contains a "safe harbor," AFNI's informal e-mail did not comply with the procedures necessary to establish this "safe harbor."

Wis. Stat. § 426.104(4)(ab) and (b) details the procedure under which an individual may obtain approval from the administrator for an act, practice or procedure:

> 1. Upon the request of any person, the administrator shall review any act, practice, procedure or form that has been submitted to the administrator in writing to determine whether the act, practice, procedure or form is consistent with chs. 421 to 427 and 429
>
> (b) Any act, practice or procedure which has been submitted to the administrator in writing and either approved in writing by the administrator or not disapproved by the administrator within 60 days after its submission to the administrator shall not be deemed to be a violation of chs. 421 to 427 and 429 or any other statute to which chs. 421 to 427 and 429 refer notwithstanding that the approval of the administrator or nondisapproval by the administrator may be subsequently amended or rescinded or be determined by judicial or other authority to be invalid for any reason.

The Wisconsin Administrative Code provides more specific procedures for obtaining agency review. Under § Wis. Adm. Code DFI-Bkg 80.82,

> Acts, practices or procedures provided to the administrator pursuant to s. 426.104 (4) (b), Stats., shall be submitted as follows:
>
> (1) The submission shall be typed or mechanically reproduced.
>
> (2) The submission shall include an original and 3 copies submitted by personal delivery, registered mail or certified mail return receipt requested; . . .
>
> (4) The submitted form shall be accompanied by a cover letter explaining the purpose for the form.

22

An informal e-mail does not appear to satisfy these procedures. Moreover, it seems unlikely that this procedure was intended to be used by collection agencies after the commencement of a suit. By submitting an e-mail after the commencement of this suit to obtain approval for its addition of collection fees, the defendant is essentially attempting to obtain a controlling ruling from another entity prior to the ruling of this court.

Although it appears that, despite the response from DFI to AFNI's e-mail query, a cellular phone contract could be considered an extension of credit, the cellular phone contracts at issue in this case do not meet the definition of a "consumer credit transaction." This is because, as will be discussed below, the plaintiffs' obligations were not payable in installments.

### d. Payable in Installments

The parties dispute whether the final prong of the definition of "consumer credit transaction," namely whether "the customer's obligation is payable in installments or for which credit a finance charge may be imposed" is met. Because the plaintiffs do not argue that their obligation was one for which a finance charge may be imposed, the only issue is whether their obligation was "payable in installments."

"Payable in installments" is defined as payment that is required or is permitted by agreement to be made in:

> (a) Two or more installments, excluding the down payment in a consumer credit sale, with respect to an obligation arising from a consumer credit transaction for which a finance charge is or may be imposed;
>
> (b) More than 4 installments, excluding the down payment in a consumer credit sale, in any other consumer credit transaction; or
>
> (c) Two or more installments if any installment other than the down payment is more than twice the amount of any other installment, excluding the down payment.

23

Wis. Stat. § 421.301(30).

AFNI argues that the plaintiffs did not incur a financed obligation on credit to be repaid in multiple installments on a declining balance basis. (Def.'s Reply Br. at 9.) Rather, according to AFNI, the plaintiffs' wireless agreements are for a monthly service charge and for charges for minutes used each month.

In contrast, the plaintiffs contend that the plaintiffs incurred an obligation to pay the entire amount of the contract monthly, over the contract's term. (Pl.'s Br. in Opp. at 18.) The plaintiffs again cite *Milwaukee Alarm* as support for this contention.

According to the plaintiffs, just like the contract in *Milwaukee Alarm*, the consumer pays the balance of the contract, which is the monthly fee multiplied by the months of service, over the length of the contract. Moreover, the plaintiffs note that just as in the contract with *Milwaukee Alarm*, the cellular phone contracts contain an early termination fee if the plaintiffs cancelled service before the term of service expired.

As an initial matter, the discussion in *Milwaukee Alarm* concerned whether the contract at issue in that case was an extension of credit. The court in *Milwaukee Alarm* did not discuss whether the alarm contract was payable in installments as defined by the WCA. The issues of whether a contract is an extension of credit and whether a contract is payable in installments are separate issues, and require a separate analysis. As such, the finding that the contract in *Milwaukee Alarm* was an extension of credit does not necessarily lead to the conclusion that the alarm contract was also payable in installments.

Regardless, even if the contract in *Milwaukee Alarm* could be considered payable in installments under the reasoning of the Wisconsin Court of Appeals, this does not mean that the same

24

reasoning as set forth in *Milwaukee Alarm* would lead to the same conclusion for the cellular phone contracts in this case. Indeed, in comparing the contract in *Milwaukee Alarm* and the cellular phone contracts at issue in this case, I conclude that there are material differences in the contracts.

The contract in *Milwaukee Alarm* was for a five-year service, at a cost of $19 per month. The ultimate cost of this service, if carried to term, was the monthly cost multiplied by the number of months in the contract. This monthly cost did not depend on the consumer's use of the alarm service each month. Moreover, the entire cost of the service, if carried to term, could not change from its original cost under the contract. As such, each payment of the monthly fee reduced the total amount set forth in the contract by a set amount each month. This could be seen as paying off the entire balance (the monthly cost multiplied by the number of months in the contract) through multiple installments. The consumer was not being charged each month (or quarter) for services specifically provided for that month, but rather was being allowed to pay for a five-year service in installments which were calculated as monthly payments.

In contrast, the cellular phone contracts in this case charged a minimum fee for each month, but also allowed the consumer to pay extra for minutes beyond the allotted minutes. The bill received each month is not used to pay off the amount of the entire contract, but rather to pay for the cell phone services specifically provided in the immediately preceding month. This number is set at a minimum amount, but there is no limit to the amount a consumer can pay above this minimum. Indeed, as noted by the court in *Murray*, "this credit can extend into hundreds or thousands of dollars depending on the consumer's actual use and the plan selected." 432 F.Supp.2d at 791.

As such, when the consumer gets a bill at the end of the month, the consumer is paying for the services provided for that month. The consumer cannot pay this bill in installments, but is

obligated to pay the entire bill in one lump sum. To be sure, this could be considered credit because the consumer did not have to pay for these services prior to the services being provided, and payment was deferred until the end of the month. However, this is not credit which is payable in installments.

Furthermore, the existence of a termination fee does not change the analysis. The consumer is not paying off the termination fee in installments by paying each monthly bill. Indeed, each monthly bill has no effect on the amount ultimately charged in the termination fee, as any termination of the contract prior to its expiration leads to a set fee, regardless of whether it was three months or one year into the contract. In contrast, the contract in *Milwaukee Alarm* calculated the termination fee based on the remaining balance of the agreement period.

In sum, the cellular phone contracts at issue do not constitute "consumer credit transactions" because the plaintiffs' obligations were not payable in installments. Such being the case, Wis. Stat. § 422.202(3)(b) does not apply, and the imposition of a collection fee did not violate the WCA under this provision. As to the plaintiffs' claims under § 422.202(3)(b), AFNI's motion for summary judgment will be granted, and the plaintiffs' motion for summary judgment will be denied.

**B. FDCPA Violation**

In addition to their WCA claim, the plaintiffs claim that AFNI violated the FDCPA by including a collection fee.

The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The FDCPA is "designed to protect

26

against the abusive debt collection practices likely to disrupt a debtor's life." *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 343 (7th Cir. 1997).

"Claims against debt collectors under the FDCPA are to be viewed through the eyes of the "'unsophisticated consumer.'" *Avila v. Rubin*, 84 F.3d 222, 226 (7th Cir. 1996) (citing *Gammon v. GC Servs. Ltd. Partnership*, 27 F.3d 1254, 1257 (7th Cir. 1994). "The key consideration is 'that the unsophisticated consumer is to be protected against confusion whatever form it takes.'" *Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000) (quoting *Bartlett v. Heibl*, 128 F.3d 497, 500 (7th Cir. 1997).

Under the FDCPA, "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f(1). This includes "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.*

The plaintiffs argue that AFNI's addition of a collection fee violated the FDCPA because the collection fee was neither explicitly authorized by the cellular phone contracts nor permitted by Wisconsin law. The issues of whether the collection fee was explicitly authorized or permitted by Wisconsin law will each be addressed in turn.

**a. Express Authorization by the Agreement**

The first issue to address is whether an agreement existed which expressly authorized AFNI to charge a 15% collection fee on the alleged balance. There is no violation of § 1692f(1) for including a collection fee if the debtor has contractually agreed to pay collection fees. As the Seventh Circuit has stated,

27

> when a debtor has contractually agreed to pay attorneys' fees and collection costs, a debt collector may, without a court's permission, state those fees and costs and include that amount in the dunning letter. Doing so does not violate the FDCPA.

*Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562,565 (7th Cir. 2004); *see also Shapiro v. Riddle & Assocs., P.C.*, 351 F.3d 63, 64 (7th Cir. 2003).

The plaintiffs contend that AFNI has failed to produce any agreements which authorize AFNI, as Cingular's assignee, to add on a 15% collection fee that is not related to a real expense or payment to a third party. (Pl.'s Br. at 11.) According to the plaintiffs, the contract clauses which mention collection fees state that these fees are in the nature of reimbursement for actual costs. (Pl.'s Br. at 12.)

AFNI contends that the cell phone contracts explicitly provided for the recovery of amounts charged for collection fees. In response to the plaintiffs' arguments, AFNI argues that it has the dual status of collection agency and the owner of the debt, and that the contract unequivocally states that the plaintiffs will be responsible for any fees of a third party collection agency. (Def.'s Resp. Br. at 6-7.)

Both parties agree that the plaintiffs' cell phone contracts did explicitly provide for the recovery of amounts charged for collection fees by a third party collection agency. The relevant contracts originally agreed to by the plaintiffs include a provision for the reimbursement of collection fees:

> You agree to reimburse us the fees of any collection agency, which may be based on a percentage at a maximum of 33% of the debt, and all costs and expenses, including reasonable attorneys' fees, we incur in such collection efforts.

(PPFOF ¶ 8; Blythin Decl. Ex. G at C00025.)

28

You agree to pay all costs including reasonable attorneys fees, collection fees, and court costs we incur in enforcing this Agreement through any appeal.

(PPFOF ¶ 10; Blythin Decl. Ex. G at C00202.)

If we refer your account to an attorney or agency for collection, you agree to pay our actual collection costs, including court costs and reasonable attorneys' fees, unless prohibited by law.

(PPFOF ¶ 11; Blythin Decl. Ex. K.)

These contract provisions explicitly allowed for Cingular to recover collection costs it incurred if Cingular referred the plaintiffs' accounts to a third party collection agency. However, the parties dispute whether AFNI, as both Cingular's assignee and the collection agency, could also recover a collection fee.

The plaintiffs argue that the contracts at issue only allow for the reimbursement of costs related to collection fees, and because AFNI owns the debts and is also the collection agency, it could not have incurred costs which require reimbursement. According to the plaintiffs, it would be nonsensical to argue that AFNI, as the owner of the debt, paid collection fees to itself as the collection agency which require reimbursement. (Pl.'s Br. at 13.) The plaintiffs contend that because these agreements would not have allowed Cingular to charge a collection fee if it had attempted to collect the accounts itself, AFNI is likewise not allowed to charge a collection fee as the owner of the accounts. (Pl.'s Reply Br. at 2.)

In response, AFNI argues that, as the assignee of the debt, it has the right to recover any amounts that otherwise would have been recoverable by the assignor. As such, according to AFNI, it has the right to charge a collection fee in its capacity as a debt collector, and to recover this collection fee under the terms of the cellular contracts. (Def.'s Resp. Br. at 6.)

29

As an initial matter, AFNI, as the assignee of the plaintiffs' debt, does have the right to recover any amount that would have been recoverable by the assignor, in this case Cingular. Under the common law of assignment, "the assignee steps into the shoes of the assignor, assuming his rights as well as his duties." *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 288 (7th Cir. 2005) (holding that "once assignors were authorized to charge interest, the common law kicked in and gave the assignees the same right, because the common law puts the assignee in the assignor's shoes, whatever the shoe size."); *see also Munoz v. Pipestone Fin., LLC*, 2006 U.S. Dist. LEXIS 69949, *16 (D. Minn. 2006) (noting that "courts addressing the question of whether the assignee of a credit card account received the original creditor's right to collect attorneys' fees have determined that the right is conveyed along with the account."). Neither the plaintiffs nor AFNI dispute that AFNI could recover any amount that Cingular could have recovered under the contract.

However, in light of the specific language of the various cellular contract provisions at issue, and given AFNI's position as Cingular's assignee, I conclude that AFNI was not authorized by an agreement to charge a collection fee in addition to the debt owed. As such, AFNI's conduct in charging a collection fee was in violation of 15 U.S.C. § 1692f(1) unless it was permitted by Wisconsin law.

As discussed above, AFNI, as Cingular's assignee, had the same rights as Cingular in collecting the debt. However, this does not mean that AFNI could do more than Cingular was authorized to do under the underlying agreements. At issue, therefore, is whether Cingular itself could have charged a collection fee under the terms of the agreements. I conclude that, even if Cingular was a collection agency, the agreements did not authorize Cingular to charge a collection fee.

30

To be sure, Cingular could charge for the reimbursement of a collection fee due to costs incurred from referring the account to a collection agency. The applicable language of the contracts contained language authorizing these fees, such as "If we refer your account to an attorney or agency for collection, you agree to pay our actual collection costs," "You agree to reimburse us the fees of any collection agency," or "You agree to pay all costs including . . . collection fees . . . we incur in enforcing this Agreement." As such, if an outside collection agency charged a 15% collection fee, Cingular (and any assignee) could likewise charge a 15% fee as reimbursement.

However, Cingular itself could not charge a collection fee which was neither a result of a referral of the account, nor in the nature of reimbursement of fees from a collection agency, nor due to an incurred cost. To begin with, Cingular could not "refer" the plaintiffs' accounts to itself, and then charge a collection fee as part of its collection costs. The term "refer" suggests an outside agency. Moreover, the phrase "if we refer" indicates that Cingular had the option of either collecting the debt on its own, or "if" it so chose, "referring" the account to another entity. Given that AFNI did not refer the accounts to an outside agency, AFNI, as with Cingular, could not charge a collection fee under this provision of the contract.

Furthermore, Cingular could not itself charge a collection fee under the contracts' language referencing an agreement to "reimburse" the fees of a collection agency. Simply stated, an entity cannot be reimbursed for fees which it did not pay. A 15% collection fee charged by Cingular would not be used to reimburse Cingular for any expenses related to the payment of fees, as it would not have paid a 15% fee to anyone, including itself. Likewise, AFNI did not pay a collection fee to anyone, including itself, and thus could not charge a fee for reimbursement of that collection fee.

31

Finally, Cingular could not charge a collection fee as part of a cost, "including collection fees," incurred in enforcing the contracts. This is because the 15% collection fee is not a cost Cingular would "incur." The language of the contract does not simply state that a customer agrees to "pay all costs including . . . collection fees." Rather, the contract states that the customer agrees to "pay all costs including . . . collection fees . . . we incur in enforcing this Agreement." As with the provision referencing reimbursement, a collection fee which is never paid is not a cost that Cingular would incur. Such being the case, AFNI, as with Cingular, could not charge a collection fee as part of a cost it incurred, as AFNI did not pay a collection fee to anyone.

Moreover, AFNI's status as both the assignee and the collection agency does not alter the analysis. The language of the contract speaks in terms of referral or reimbursement, and AFNI's status as a collection agency does not change the fact that it did not refer the accounts to an outside agency, and that it did not incur any costs in the nature of a collection fee that it paid to any agency.

In sum, the underlying cellular phone contracts did not authorize AFNI to charge a collection fee, regardless of the amount.[6] The plaintiffs' contracts contemplated reimbursement of costs, including collection fees, paid by Cingular (and its assignee). Simply stated, AFNI did not pay any costs which required reimbursement.

**b. Permitted by Law**

Although the collection fee was not authorized by agreement, the fee does not violate the FDCPA if it was authorized by Wisconsin law. In order to establish a violation of § 1692f(1), the

---

[6]The parties also dispute whether, assuming a collection fee was authorized by the underlying agreements, AFNI was allowed to charge a flat 15% collection fee unrelated to its actual collection expenses. However, as AFNI could not charge any collection fees under the contracts, it is not necessary to address this issue.

32

plaintiff has to "show that the money demanded from him was 'incidental' to a claimed debt and that the claimed obligation to pay it arose neither by agreement nor by operation of law, in which event it would be 'permitted by law' to be the subject of a collection action." *Shula v. Lawent*, 359 F.3d 489, 492-93 (7th Cir. 2004) (citing *Freyermuth v. Credit Bureau Services, Inc.*, 248 F.3d 767, 770-71 (8th Cir. 2001); *Johnson v. Riddle*, 305 F.3d 1107, 1117-21 (10th Cir. 2002)).

AFNI argues that any general authorization under state law satisfies the "permitted by law" prong of § 1692f(1). In support, AFNI cites *Riddle*, in which the court stated:

> Neither party disputes the district court's conclusion that, in interpreting the phrase permitted by law, "'a general statutory authorization' satisfies the FDCPA; that is, rather than pointing to a state statute that expressly permits a particular imposition of fee, one need only identify some state statute which 'authorizes or allows, in however general a fashion, the fees or charges in question.'"

*Riddle*, 305 F.3d at 1118.

AFNI specifically contends that where state law allows for the recovery of damages incidental to a breach of contract, the debt collector may recover commercially reasonable charges associated with collection under § 1692f(1). (Def.'s Br. at 24.) AFNI cites *Freyermuth* as support for such contention.

In *Freyermuth*, the court held that the debt collector did not violate § 1692f(1) by attempting to collect service fees where the applicable state law of Nebraska authorized the seller to seek reimbursement for incidental damages incurred due to the buyer's breach. 248 F.3d at 770-71. The applicable state law was U.C.C. § 2-710, which states:

> Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach. Such incidental damages may include any commercially reasonable charges.

33

Moreover, the court in *Freyermuth* noted that "[a] person 'in the position of a seller' can also recover incidental damages," pursuant to Nebraska state law and the UCC. 248 F.3d at 770.

The plaintiff in *Freyermuth* wrote various checks which were returned to various merchants due to insufficient funds. *Id*. at 769. The various merchants referred the checks to the defendant debt collector to collect on the amounts due, although the merchants retained ownership of the debts. *Id*. at 771. In this way, according to the court in *Freyermuth*, "[the debt collector] 'became responsible for' the debts, and thus stands in the position of the merchants for purposes of collecting incidental damages, in the form of a commercially reasonable charge." *Id*.; *citing Tuttle v. Equifax Check*, 190 F.3d 9, 14-15 (2d Cir. 1999). As such, the court in *Freyermuth* concluded that the debt collector did not violate Nebraska law when imposing service fees, and did not violate the FDCPA when attempting to collect the service fees. *Id*. It was undisputed that there was no express authorization by agreement to charge service fees. *Id*. at 770.

AFNI concedes that the cellular phone contracts at issue are not governed by the UCC. However, AFNI argues that, just as with the UCC provisions in *Freyermuth*, Wisconsin law similarly allows for the recovery of commercially reasonable charges incidental to a breach of contract, including collection fees. In particular, AFNI cites Wisconsin Jury Instructions relating to breach of contract. (Def.'s Br. in Opp. at 11.) Wisconsin Jury Instructions - Civil 3710 reads as follows:

Consequential Damages for Breach of Contract

The law provides that a person who has been damaged by a breach of contract shall be fairly and reasonably compensated for his or her loss. In determining the damages, if any, you will allow an amount that will reasonably compensate the injured person for all losses that are the natural and probable results of the breach.

Furthermore, Wisconsin Jury Instructions - Civil 3720 reads as follows:

34

Damages: Incidental

> Damages may be awarded in such sum as will compensate the injured party for expenses reasonably incurred in the inspection, receipt, transportation, care, or resale of goods or merchandise; and for commissions, interest, and any other reasonable expense incident to the breach of the contract.

AFNI argues that the incidental expenses discussed in Wis. JI-Civil 3720 are identical to the incidental expenses contemplated by UCC 2-710. AFNI thus contends that collection fees are recoverable under Wisconsin law as expenses incident to the plaintiffs' breach of their cell phone contracts.

In response, the plaintiffs argue that with respect to the addition of a collection fee in consumer credit transactions, the UCC and common law are superceded by the WCA. Specifically, the plaintiffs contend that Wis. Stat. § 422.202(3)(b) supercedes the UCC and common law, as it prohibits AFNI's collection fee in consumer credit transactions. (Pl.'s Reply Br. at 11.)

However, as discussed above, the cellular phone contracts at issue are not consumer credit transactions, and thus Wis. Stat. § 422.202(3)(b) does not apply. To be sure, particular provisions of the WCA would supercede common law and the UCC if they were in direct conflict. *See* Wis. Stat. § 421.103(1) ("Unless superseded by the particular provisions of chs. 421 to 427, chs. 401 to 411 and the principles of law and equity, including the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause supplement chs. 421 to 427") and Wis. Stat. § 421.103(3) ("Unless superseded by the particular provisions of chs. 421 to 427 parties to a consumer transaction have all of the obligations, duties, rights and remedies provided in chs. 401 to 411 which apply to the transaction"). However, as seen by the language of Wis. Stat. § 421.103(1) and (3), the common law

and UCC supplement the WCA if there are no particular WCA provisions that supercede them. Given that Wis. Stat. § 422.202(3)(b) does not apply to the contracts at hand, the common law and UCC supplement the WCA as it applies to the contracts at issue, and the plaintiffs' argument that Wisconsin common law does not apply is unavailing.

At issue, therefore, is whether Wisconsin law permits the addition of collection fees for the plaintiffs' breach of their cellular phone contracts. I conclude that Wisconsin law does not permit this additional fee, as it does not permit the addition of a collection fee which is not related to compensation to an injured party for expenses incurred due to a breach of contract.

As an initial matter, Wisconsin jury instructions do provide some authority as to what Wisconsin law permits under contract law. The Wisconsin Supreme Court has held that "while jury instructions are not precedential, they are of persuasive authority." *State v. Olson*, 175 Wis. 2d 628, 644, 498 N.W.2d 661, 667 (Wis. 1993).

However, the jury instructions only provide for reasonable compensation for losses and expenses incurred due to the breach of contract. As noted above, AFNI has not incurred any losses or expenses due to the breach of contract. The collection fee is not related to any expense incurred by AFNI, as it did not pay any fees for which it required reimbursement. Simply stated, there are no losses or expenses for which AFNI needs to be compensated.

Moreover, Wis. JI-Civil 3720 references the sale of goods or merchandise, and the comments section to this jury instruction references Wis. Stat. §§ 402.710 and 402.715, which correspond to Article 2 of the UCC. Just as the UCC does not apply to the contracts for cellular services, it is questionable whether a jury instruction based on the UCC and which explicitly references damages relating to the sale of goods and merchandise would apply to a contract for services.

36

Furthermore, in contrast to the situation in *Freyermuth*, the original debtor in this case, Cingular, no longer owned the debts and did not incur an expense in referring the debt for collection. The original debtor in *Freyermuth* enlisted the services of the collection agency and presumably incurred an expense in doing so. The collection agency in *Freyermuth* then charged a fee which reflected the original debtor's incidental damages due to the added expenses from referral to the collection agency. *See also Tuttle*, 190 F.3d at 15 ("[the defendant's] service charge constitutes incidental damages to the extent that it offsets the collection expenses.")

In sum, the addition of a collection fee by AFNI, which was not related to an expense or loss that required compensation, is not permitted by Wisconsin law. Such being the case, AFNI's collection fee violates the FDCPA because it was neither authorized by agreement nor permitted by law. The plaintiffs are entitled to summary judgment on their claims under 15 U.S.C. § 1692f(1), unless AFNI qualifies for the bona fide error defense.

**c. Bona Fide Error**

Even though there does not exist a genuine issue of material fact as to whether AFNI's collection fee violated 15 U.S.C. § 1692f(1), the plaintiffs are not entitled to summary judgment (and AFNI may be entitled to summary judgment) if AFNI qualifies for the bona fide error defense. Under 15 USCS § 1692k(c),

> A debt collector may not be held liable in any action brought under this title [15 USCS §§ 1692 et seq.] if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

In order for AFNI to qualify for the bona fide error defense, "(1) it must show that the presumed FDCPA violation was not intentional; (2) it must show that the presumed FDCPA

violation resulted from a bona fide error . . . and (3) it must show that it maintained procedures reasonably adapted to avoid any such error." *Kort v. Diversified Collection Servs.*, 394 F.3d 530, 537 (7th Cir. 2005).

Although the first prong of the bona fide error defense is a subjective test, the second and third prongs are necessarily objective tests. *Johnson v. Riddle*, 443 F.3d 723, 729 (10th Cir. 2006) (citing *Kort*, 394 F.3d at 538); *see also Rosado v. Taylor*, 324 F. Supp. 2d 917, 933 (N.D. Ind. 2004); *Hartman v. Meridian Fin. Servs., Inc.*, 191 F. Supp. 2d 1031, 1045 (W.D. Wis. 2002).

In order to meet the first prong of intent, "[a] debt collector need only show that its FDCPA violation was unintentional, not that its actions were unintentional." *Kort*, 394 F.3d at 537. As to the second prong, whether the error was bona fide, Encore must show that the error "was an error made in good faith; a genuine mistake, as opposed to a contrived mistake." *Id*. at 538 (see Black's Law Dictionary 168 (7th ed. 1999)) (defining "bona fide" as "1. Made in good faith; without fraud" and "2. Sincere; genuine").

The final prong, the procedures component, involves a two-step inquiry: "first, whether the debt collector 'maintained'--i.e., actually employed or implemented--procedures to avoid errors; and, second, whether the procedures were 'reasonably adapted' to avoid the specific error at issue." *Johnson*, 443 F.3d at 729; *see also Jenkins v. Heintz*, 124 F.3d 824, 834, 835 (7th Cir. 1997). "[Section] 1692k(c) does not require debt collectors to take every conceivable precaution to avoid errors; rather, it only requires reasonable precaution." *Kort*, 394 F.3d at 539; *see also Hyman v. Tate*, 362 F.3d 965, 968 (7th Cir. 2004) ("Although [the debt collector] could have done more . . . , § 1692k(c) only requires collectors to adopt reasonable procedures.").

38

The plaintiffs argue that AFNI has failed to meet the second and third prongs of the bona fide error test. Specifically, the plaintiffs contend that AFNI's error fails to meet the second prong because it was not bona fide, as it was not a reasonable position taken in light of applicable law. Furthermore, the plaintiffs argue that AFNI did not have or follow any reasonable procedures to assess the legality of the collection fee. In response, AFNI argues that its legal position was reasonable in light of existing law, and that it does maintain reasonable procedures adapted to avoid such errors.

A violation of law may be bona fide if the legal position taken is reasonable in light of the applicable law. *See Kort*, 394 F.3d at 538. In *Kort*, the court held that the violation was bona fide because the debt collector had relied on a statutory interpretation by the Department of Education, which was the government agency invested with regulatory authority over the statute in question. *Id.* The Department of Education had misinterpreted the statute, but the court found that it was reasonable for the defendant to rely on the government agency's interpretation. *Id.*; *but see Hartman*, 191 F. Supp. 2d at 1045 (bona fide error not available where defendant was mistaken as a matter of law, rather than a clerical error.); *Bawa v. Bowman, Heintz, Boscia & Vician*, 2001 U.S. Dist. LEXIS 7842 (S.D. Ind. May 30, 2001) (bona fide error defense does not protect those who simply misunderstand obligations imposed by FDCPA).

However, the Seventh Circuit has held that the bona fide error defense does not apply when a debt collector's actions are in plain contravention of existing case law. *Nielso*n, 307 F.3d at 641. In *Nielso*n, the court held that a debt collector which sent thousands of form letters bearing the facsimile signature of an attorney who had not had any active involvement with the debtor's file contravened the court's previous opinion in *Avila v. Rubin*. *Id.* As described by the court in *Nielson*,

39

in *Avil*a, the court had held that "an attorney must have some professional involvement with the debtor's file in order for the presence of his name on a delinquency not to be misleading." 84 F.3d at 229 (citing *Avila*, 84 F.3d at 229.)

The court in *Nielson* also cited with approval the discussion in *Hulshizer v. Global Credit Servs., Inc.*, 728 F.2d 1037 (8th Cir. 1984). In *Hulshizer*, the court held that the bona fide error defense was not available where "the language of the statute [was] unambiguous and [the creditor's] disregard of that language [was] undisputed." 728 F.2d at 1038. The defendant in *Hulzhizer* had failed to disclose in its communication to the plaintiff "that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose," as required under § 1692e(11).

In the case at hand, the language of the FDCPA is unambiguous in prohibiting the addition of a collection fee unless such fee is expressly authorized by the agreement creating the debt or permitted by law. It does not appear that AFNI mistakenly believed that it could add a collection fee in the absence of an authorization in the agreement or in the absence of applicable state law. Rather, the errors, which were errors of law, were in concluding that the specific agreement in question and Wisconsin law authorized the addition of a collection fee.

I conclude that AFNI is not entitled to the bona fide error defense because it fails the second prong of the test, as its error was not a bona fide error. To begin with, AFNI's reading of the underlying agreements was not reasonable in light of the applicable law. As discussed above, the agreements did not authorize a collection fee which was neither a result of a referral of the account, nor in the nature of reimbursement of fees from a collection agency, nor due to an incurred cost. In order to determine that these agreements did in fact authorize the addition of a collection fee, AFNI

40

had to interpret them as allowing for the reimbursement of collection fees paid by AFNI to itself. This interpretation of the contracts is not sufficiently reasonable to qualify as a bona fide error.

In regards to the interpretation of Wisconsin law, AFNI's interpretation was likewise not reasonable. A reliance on jury instructions which reference compensation for damages due to a breach of contract, and which reference damages in relation to the sale of goods and merchandise, is not sufficient to justify the conclusion that Wisconsin law permits the addition of a collection fee unrelated to any loss or expense, and which involved a contract for services.

Moreover, it is unclear whether AFNI genuinely believed that Wisconsin law permitted the addition of collection fees absent an agreement. Indeed, in AFNI's letter to DFI, AFNI specifically stated: "a contract was signed which provided for the creditor to add fees related to the collection of a consumer account. However, I do not see that this is specifically provided for under Wisconsin law." Given that AFNI apparently did not believe Wisconsin law specifically provided for the addition of collection fees even with express authorization in a contract, it is unlikely that AFNI genuinely believed Wisconsin law permitted the addition of collection fees in the absence of authorization in a contract.

Moreover, regardless of whether AFNI's errors were bona fide, AFNI did not maintain procedures "reasonably adapted" to avoid the specific errors at issue. To be sure, AFNI has listed various general procedures it uses to ensure compliance with the FDCPA. However, the first error at issue in this case is whether the specific cellular contracts allowed for the addition of a collection fee. AFNI has admitted that it does not examine each and every Cingular form customer service agreement to determine whether the agreement purports to allow AFNI to collect a collection fee. (PPFOF ¶ 21.) A procedure "reasonably adapted" to avoid this type of error, namely the

41

interpretation of specific contracts, would necessarily require the examination of the contracts at issue. Such being the case, AFNI's potential failure to read the specific contract provisions at issue indicates a lack of sufficient procedures adapted to avoiding errors in contract interpretation.

Furthermore, AFNI does not maintain procedures to ascertain whether Wisconsin state law permits the recovery of collection fees not authorized by contract. AFNI lists general procedures, such as the reliance on "ACA's Guide to State Collection Laws and Practices, December 1998," as well as other bulletins. AFNI also contends that it reviews provisions of the WCA. However, these general procedures are not reasonably adapted to ascertaining whether specific state contract law allows for the addition of collection fees in the absence of express authorization.

In sum, AFNI is unable to show that the presumed FDCPA violation resulted from a bona fide error, or that it maintained procedures reasonably adapted to avoid any such error. Such being the case, AFNI's addition of collection fees violated the FDCPA.

**C. WCA Violation Due to Alleged Violation of the FDCPA**

The plaintiffs argue that AFNI's collection fee violates § 427.104(j) of the WCA because of AFNI's violation of the FDCPA. This statutory section states, in relevant part:

> 427.104. Prohibited practices.
>
> (1) In attempting to collect an alleged debt arising from a consumer credit transaction or other consumer transaction, including a transaction primarily for an agricultural purpose, where there is an agreement to defer payment, a debt collector may not: . .
>
> (j) Claim, or attempt or threaten to enforce a right with knowledge or reason to know that the right does not exist;

Wis. Stat. § 427.104(j).

42

A violation of § 427.104(j) necessarily depends upon whether AFNI violated the FDCPA or another provision of the WCA. Moreover, even if AFNI's conduct did violate the FDCPA, under § 427.104(j) AFNI must still have known or had reason to know that its conduct violated the FDCPA.

Given that AFNI did violate the FDCPA, as the addition of a collection fee was not authorized by agreement or permitted by law, at issue is whether AFNI knew or should have known that it did not have the right to seek this collection fee. "Under the WCA, the creditor has the duty to avoid mistakes of law." *Kett v. Community Credit Plan, Inc.*, 222 Wis. 2d 117, 135, 586 N.W.2d 68, 76 (Wis. Ct. App. 1998).

For the same reasons that AFNI does not qualify for the bona fide error defense, I conclude that AFNI should have known it did not have the right to collect a collection fee. As noted above, a reasonable reading of the contracts would not lead to a conclusion that AFNI was entitled to ask for reimbursement for collection fees charged to itself. Furthermore, as noted above, AFNI should have known that Wisconsin law does not permit the addition of a collection fee unrelated to any loss or expense, and which involved a contract for services. Moreover, there is evidence that AFNI actually knew that Wisconsin state law did not specifically provide for the addition of a collection fee due solely to breach of contract principles.

## V. CONCLUSION

AFNI's addition of collection fees did not violate Wis. Stat. § 422.202 because the cellular phone contracts were not consumer credit transactions as defined under the WCA. However, AFNI's addition of collection fees did violate § 1692f(1) of the FDCPA, as well as § 427.104(j) of the WCA.

43

The collection fees at issue were not authorized by the cellular phone agreements, and were not permitted by state law.  Furthermore, AFNI is not entitled to the bona fide error defense.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED** that the plaintiffs' motion for summary judgment be and hereby is **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED** that a scheduling conference be conducted on Friday, June 22, at 10:00 a.m. in Room 253 of the U.S. Courthouse, 517 E. Wisconsin Avenue, Milwaukee, WI 53202.  At that time the court will discuss with the parties the steps necessary to bring this case to final resolution.

**SO ORDERED** this <u>1st</u> day of June 2007, at Milwaukee, Wisconsin.


<u>/s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

44